PACOLET MANUFACTURING COMPANY *v.* WEISS.

288

No. 11849. December 2, 1937. Adhered to on rehearing, December 16, 1937.

*Felix Hebert, Barry Wright,* and *Edgar B. Dunlap,* for plaintiff in error.

*W. L. Bryan* and *R. W. Smith Jr.,* contra.

Bell, Justice. Sidney Weiss, proceeding as an informer, instituted an action in the superior court of Hall County, Georgia, against Pacolet Manufacturing Company, a South Carolina corporation doing business in the State of Georgia. The object of the suit was to recover a statutory penalty of ten per cent. on sums alleged to have been paid to the defendant by insurers for windstorm damage suffered by the defendant at its manufacturing plant at Gainesville, Georgia, on April 6, 1936. The alleged ground of liability was that the policies of insurance on which the defendant collected for such damage were issued by non-admitted insurance companies, in violation of the act of the General Assembly approved March 28, 1935, and that the defendant accepted such policies without thereafter complying with duties imposed upon it by the same statute, in such case. Ga. L. 1935, p. 139. After several amendments by the plaintiff, general and special demurrers filed by the defendant were overruled, and the defendant excepted. The petition as amended alleged that the policies aggregated over $3,000,000, that the defendant was paid the sum of $851,108.64, and that the plaintiff is entitled to recover ten per cent. of the latter sum. The plaintiff being a citizen of Georgia and the defendant a non-resident corporation, the defendant first applied for an order removing the case to the Federal court. This application was refused, and the propriety of this ruling is one of the questions presented by the bill of exceptions. The defendant has also drawn into question both the construction and the validity of the act of 1935, on which the plaintiff's claim is founded. The material portions of this act are contained in the caption and section 2, reading as follows:

(Caption.) "An act to amend chapter 56-5, entitled 'Agents

and Solicitors' of the title 56, 'Insurance,' of the Code of Georgia of 1933. The said section of the Code as hereby amended is section 56-508, and new sections are to be added to the said Code. The said Code being amended to make the provisions of the same applicable to the business of writing fidelity and surety bonds in this State; to provide for the licensing and examination of agents for license; to provide for the establishment of Agent's Association; to prevent the writing or acceptance of such insurance contracts and/or bonds issued by non-admitted insurers; to provide penalties, and for the enforcement thereof for the violation of any of the provisions hereof; to provide for the repeal of any law or laws in conflict herewith; and for other purposes."

"Sec. 2. Be it further enacted that there shall be added to the said chapter 56-5, relating to 'Agents and Solicitors,' of title 56—Insurance, of the Georgia Code, after section 56-522 thereof, the following new sections:

"(1) No corporation, individual, firm, or association not licensed in Georgia to transact the business of a fire and casualty insurance, or the writing and issue of fidelity and surety bonds, shall so engage in such business within the limits of this State; nor shall any person act as agent for any company, individual, firm, or association engaged in the writing of such business, unless such person has himself first received a license from the Insurance Department to represent a company duly authorized in the State. Penalty for the violation of this provision on the part of the corporation, individual, firm, or association illegally engaged in the writing of business in this State as herein provided, shall be $1,000 for the first offense and $2,000 for each additional offense. It shall be deemed a misdemeanor for any person to act as agent for any such company without such person having first received a license as provided herein.

"(2) No individual, firm, corporation, or association residing or doing business in this State shall accept a policy of fire or casualty insurance, or fidelity or surety bond, issued by a non-admitted company, individual, firm, or association in violation of the preceding section, unless such individual, firm, corporation, or association shall immediately report the fact to the Insurance Commissioner, giving the name of the company issuing the policy or contract, stating its amount and the premium paid thereon, and shall there-

upon pay to the Insurance Commissioner the license fee properly chargeable against such company if it were admitted to the State, and the premium tax chargeable under the general tax act upon the amount of premium so paid. Failure so to report and pay the license fee and premium tax herein mentioned shall subject such individual, firm, corporation, or association to a penalty of 10% of any such sum as may be paid as indemnity by such insurer to the assured in the event of a loss. Such penalty may be collected upon the establishment of such fact in a civil suit by any informer in any court having jurisdiction thereof, one half of the amount of such recovery to go to the informer and the other half to be paid to the insurance commissioner to be placed by him in the general funds of the State; or the same may likewise be recovered upon the establishment of such fact in a civil suit brought in the name of the State of Georgia by the solicitor-general of the circuit where such act may have been done, in which event the solicitor-general shall be paid 10% of the amount received." Ga. L. 1935, pp. 139, 143-145.

The petition as amended alleged substantially the following: The defendant is a non-resident corporation engaged in the cotton textile manufacturing business with its home office at Pacolet, South Carolina, but owning and operating a manufacturing plant and store at New Holland, Georgia, which is a village adjacent to the City of Gainesville, in Hall County, Georgia. In April, 1935, the defendant accepted specified policies of fire and casualty insurance on its property at New Holland, Georgia, which were issued in violation of section 2, paragraph 1, of the aforesaid act, in that the companies issuing them were not admitted and authorized to do an insurance business in the State of Georgia. The policies were issued on April 23, 1935. They were issued and accepted with the intent and purpose on the part of the insurers and the insured that the insurers would transact the business of fire and casualty insurance with respect to such property located in Georgia, and that inspections, appraisals, and adjustments would be done in this State, in the performance of such contracts. After accepting the policies and paying the premiums, the defendant did not immediately report the fact to the insurance commissioner of the State of Georgia by giving the names of the companies issuing the policies, stating their amounts and the premiums paid thereon,

and did not thereupon pay to the insurance commissioner of the State of Georgia the license fee properly chargeable against the said companies if they had been admitted to the State, and the premium tax chargeable under the general tax act upon the amount of the premiums so paid. There was incorporated in each policy a plat of the insured property, as prepared by one J. R. Condon on November 21, 1932, and it was the practice of the insurers to supplement this plat by having their agents make inspections of the property at frequent intervals. Reports of these inspections were reduced to writing, and a copy was furnished to each of the insurance companies and to the defendant, the defendant's copies being kept on file at its office at New Holland, Georgia. During the life of the policies and in keeping with such practice, O. F. Davenport, an agent and inspector for such insurers, made an inspection in company with the superintendent and the master mechanic of this mill, on August 16, 1935. Each policy contained the following stipulations: In the event of disagreement as to the amount of the loss, the insured and the insurer would each appoint an appraiser, who together would appoint an umpire, but on the failure of such appraisers to agree upon an umpire, then on request of either the insured or the company "such umpire shall be selected by a judge of a court of record in the State in which the property insured is located." The appraisers shall then appraise the loss, submitting their differences, if any, to the umpire. An award in writing by any two, when properly itemized and filed with the company, shall determine the amount of sound value and loss or damage. The company shall have the option to take any or all of the damaged property at the agreed or appraised value, and also to repair, rebuild, or replace such property, in settlement of the loss.

The petition further alleged that the insurers actually elected to exercise their option to make settlement by replacing and rebuilding the property, and did execute such settlement according to a method agreed upon between them and the insured, as follows: Invoices for the cost of replacement and reconstruction were paid by the Pacolet Company, the insured, which in turn was reimbursed by the insurers, after credits for salvage. The sums thus paid by the insurers amounted to $551,108.64. The insurers also paid the sum of $300,000 for loss of use and occupancy, making a total

of \$851,108.64. These adjustments were perfected by a named chief adjuster for the insurers, assisted by several additional adjusters, all being so engaged in behalf of the insurers, for several weeks at New Holland, Georgia. The petition further alleged that not only had each of the named insurance companies failed to obtain permission or license to do business in the State of Georgia, but that none of their agents, inspectors, or adjusters had any license to do an insurance business of any kind in this State at the time the policies were issued and accepted or at the subsequent times when the obligations of the policies were performed in this State.

The demurrers filed by the defendant contained the following grounds: (1) The petition fails to allege a cause of action, because it does not show a violation of the act of 1935. (2) The petition fails to show where any of the policies were issued, accepted, or paid for, and does not allege that any of these acts were done in the State of Georgia. (3) The allegations that inspections, appraisals, and adjustments were performed in the State of Georgia, and that such performance was contemplated by the parties at the time of the issuance and acceptance of the policies, are irrelevant and immaterial. (4) The act of 1935 is unconstitutional and void, for the following reasons: (a) It violates the due-process and equal-protection clauses both of the Federal and the State constitutions. (b) It refers to more than one subject-matter and contains matter different from what is expressed in its title, violating in these particulars the constitution of Georgia. (5) Additional grounds which are subordinate to the above, and need not be stated.

■ The judge did not err in refusing the defendant's application to remove the case to the Federal court. If the action could not have been properly brought in the Federal court, it could not be removed to that court from the State court in which it was instituted. *Pullman Co.* v. *Sutherlin*, 150 *Ga.* 652 (104 S. E. 782). This being an action by an informer to recover a penalty under a State statute, the district court of the United States would not have had jurisdiction of the case if it had been originally filed in that court. The act of 1935 declares that such a penalty may be collected "in a civil suit" by an informer, and the Federal statutes on jurisdiction and removal refer to suits of "a civil nature at law or in equity." U. S. C. A., title 28, §§ 41-71. The Fed-

eral statutes, however, relate to the character of the action as distinguished from its form, and the act of 1935 contains a classification as to form only. In Wisconsin v. Pelican Ins. Co., 127 U. S. 265 (8 Sup. Ct. 1370, 32 L. ed. 239), it was said that the courts of no country will execute the penal laws of another, and that this rule applies as between State and Federal courts, not only to prosecutions for crimes, but also to actions in favor of the State for the recovery of pecuniary damages for the violation of its statutes. In Younts v. Southwestern Telegraph &c. Co., 192 Fed. 200, it was held that while the Federal courts have jurisdiction to entertain actions for the recovery of penalties allowed by State statutes to compensate individuals for injuries sustained, they will not entertain jurisdiction of a suit to recover a penalty for the use of the State, although the nominal plaintiff is an individual and a part of the penalty goes to him as an informer. So, in the instant case, the object of the action being to recover a penalty for the use of the State, the court properly refused the application for removal, notwithstanding a portion of the recovery, if any, would go to the plaintiff as informer.

■ For convenience the case will be discussed hereinafter as if only one policy and one insurer were involved. Briefly summarized, the main contentions are as follows: The defendant contends that the act of 1935, so far as it imposes a penalty upon an insured, does not by its terms apply in any case unless the policy was issued and accepted within the limits of this State. Accordingly, the defendant demurred to the petition both generally and specially, because there is no allegation that the policy was issued or accepted in the State of Georgia. On the other hand, the plaintiff contends, that, under the language of the act, it is immaterial where the policy is accepted, provided it covers property situated in this State, is issued to a person residing or doing business in the State, and contemplates the performance of acts by the insurer which will amount to the transaction of an insurance business therein. Claiming that such are the facts of the present case, the plaintiff further insists that he was not required to allege where the policy was issued or accepted, whether in the State of Georgia or elsewhere. The defendant further contends that if the statute should be construed as applying by its language to the acceptance of a policy without the State of Georgia, the statute is

unconstitutional and void as against the insurer, in that it violates the due-process and equal-protection clauses of both the State and the Federal constitutions; and that such is the result, irrespective of the terms and conditions of the policy, and of what the parties may have contemplated as to the performance of its obligations within the limits of this State. To support this contention, the following decisions, among others, have been cited: Allgeyer *v.* Louisiana, 165 U. S. 578 (17 Sup. Ct. 427, 41 L. ed. 832); St. Louis Cotton Compress Co. *v.* Arkansas, 260 U. S. 346 (43 Sup. Ct. 125, 67 L. ed. 297); Compania General de Tabacos de Filipinas *v.* Collector of Internal Revenue, 275 U. S. 87 (48 Sup. Ct. 100, 72 L. ed. 177). The plaintiff replies that where a policy is intended to be performed by inspections, appraisals, and adjustments in this State, it necessarily contemplates the doing of an insurance business within the State, and that as applied to such a policy the statute is a valid exercise of the police power, and constitutional, regardless of where the contract may have been executed. As supporting this contention, the plaintiff has cited, among others, the following decisions: Pennsylvania Lumbermen's Mutual Fire Ins. Co. *v.* Meyer, 197 U. S. 407 (25 Sup. Ct. 483, 49 L. ed. 810); Bothwell *v.* Buckbee-Mears Co., 275 U. S. 274 (48 Sup. Ct. 124, 72 L. ed. 277); Compania General de Tabacos de Filipinas *v.* Collector of Internal Revenue, supra. The defendant also contends that the act is invalid under the State constitution, because it refers to more than one subject-matter and contains matter different from what is expressed in its title. Still other contentions are made and resisted.

The questions thus presented have all received our careful consideration; but the conclusion we have reached as to one of them renders it unnecessary to discuss the others, and makes it actually improper to give any decision on the constitutional questions. It is our opinion that the act of 1935, so far as it penalizes an insurer, has no application where the policy was issued and accepted without the limits of this State. In this view, the petition did not state a cause of action, for the reason that it failed to allege that the policy was either issued or accepted in the State of Georgia. This conclusion will dispose of the entire case, without reference to other questions; and it is a settled rule that the constitutionality of a statute will not be determined unless it is positively necessary

to a decision of the case. *Mystyle Hosiery Shops Inc.* v. *Harrison,* 171 *Ga.* 430 (3) (155 S. E. 765) ; *Georgia Power Co.* v. *Decatur,* 173 *Ga.* 219 (3) (159 S. E. 863). The statute, in relation to the matter in hand, is highly penal in character, and in case of doubt it should be construed most strongly against the State. *Polk* v. *Thomason,* 130 *Ga.* 542, 544 (61 S. E. 123) ; *Southern Cotton-Oil Co.* v. *Raines,* 171 *Ga.* 154 (5-*b*) (155 S. E. 484).

The most important rule, however, is to ascertain the intention of the legislature; and these are the only two rules of construction which we deem it necessary to apply in the present case. We expressly exclude from consideration the rule that if a statute is reasonably susceptible of two constructions, one harmonizing it with the constitution and the other rendering it unconstitutional, the former construction is generally to be preferred. *Smith* v. *Evans,* 125 *Ga.* 109, 112 (53 S. E. 589) ; *Fordham* v. *Sikes,* 141 *Ga.* 469 (81 S. E. 208). An application of this rule would imply a conclusion or conclusions as to constitutional questions; whereas we do not consider it necessary to pass upon any such question, even by inference, in this case. Our decision therefore will relate only to what the legislature has actually done, with no reference to its *power* in regard to the general subject. With these observations, we will now examine the statute for the purpose of determining its meaning in relation to the case under consideration. As shown in the preceding statement, section 2 of the act contains several numbered paragraphs or subsections which are referred to as "new sections." The phrase "the preceding section" as contained in subsection 2 therefore refers to the preceding subsection, and both of these paragraphs or subsections will be hereafter designated as *sections.* With irrelevant matter eliminated, section 1 is as follows: "No corporation . . not licensed in Georgia to transact the business of . . casualty insurance, or the writing and issue of fidelity and surety bonds, shall so engage in such business within the limits of this State; nor shall any person act as agent for any company . . engaged in the writing of such business, unless such person has himself first received a license from the insurance department to represent a company duly authorized in the State. Penalty for the violation of this provision on the part of the corporation . . illegally engaged in the writing of business in this State as herein provided shall be $1,000 for the first

offense and $2,000 for each additional offense." Section 2 provides that no "corporation . . residing or doing business in this State shall accept a policy of . . casualty insurance . . issued by a non-admitted company . . in violation of the preceding section, unless such . . corporation . . shall immediately report the fact to the insurance commissioner, giving the name of the company issuing the policy, . . stating its amount and the premium paid thereon, and shall thereupon pay to the insurance commissioner the license fee properly chargeable against such company if it were admitted to the State, and the premium tax chargeable under the general tax act upon the amount of premium so paid." The acceptance of a policy so illegally issued and the failure to make the required report and payments will subject the insured to "a penalty of 10% of any such sum as may be paid as indemnity by such insurer to the assured in the event of a loss."

Is a policy issued "in violation of the preceding section" unless it is issued within the limits of the State of Georgia? It would seem to be clear that the mere issuance of an insurance policy in another State would not within itself amount to the transaction of insurance business within the State of Georgia, although the policy may contain stipulations which in the event of a loss will require the transaction of such business within the limits of this State. Knights Templars Indemnity Co. v. Jarman, 187 U. S. 197, 204 (23 Sup. Ct. 108, 47 L. ed. 139); Pennsylvania Lumbermen's Mutual Fire Ins. Co. v. Meyer, supra. The policy here necessarily contemplated that in the event of a loss certain acts would be done by the insurer in this State, and it appears that these acts were so done by the insurer in the performance of its obligation. Even if these acts amounted to the transaction of insurance business within the State, they were all subsequent to the issuance and acceptance of the policy; and consequently the fact that they were so performed did not make it true that the policy "was issued in violation of the preceding section." We do not overlook the fact that the policy was based upon a plat which was made in the year 1932, but this fact should be excluded because of its occurrence before the passage of the act of 1935, on which the instant suit was predicated. Section 1 refers to the transaction of the business of casualty insurance, the writing and issue of stated classes of bonds,

the engaging "in such business within the limits of this State," "the writing of such business," and finally to a penalty against an insurer "illegally engaged in the writing of business in this State." From these and other provisions, and in view of the applicable rule of strict construction, we can not agree that a policy is issued in violation of this section, where it is not issued in this State. We are compelled to look to these expressions for a description of the acts which a non-admitted insurance company is prohibited from doing, and reasonably construed they do not include the issuance of a policy elsewhere than in the State of Georgia. In other words, whether or not the legislature might have had authority to prescribe the conditions on which such a policy of insurance as the instant one could be issued elsewhere than in this State, it is apparent that no such power was attempted in this legislation, and that the statute is confined solely to acts performed within the borders of this State.

If the policy was not "issued in violation of the preceding section," there is no penalty against the insured for accepting it, no matter what else the insured may have done or failed to do, and regardless of whether the insurer may *otherwise* have violated "the preceding section," either before or after the issuance of the policy. The insurance company, after the issuance of this policy and in the performance of it as a contract, may have transacted the business of insurance within the State, so as to become itself subject to penalty as a non-admitted insurer; but there is no penalty against the *insured,* unless it appears, among other things, that the initial act of issuing the policy was prohibited by the law. Let us suppose, for the moment, that this policy, with all of the stipulations noted, was issued and delivered without the State of Georgia, but that no loss occurred, and that the insurer was never required to perform any act in pursuance of its obligations, and performed none. Could it be said in such case that the mere issuance of the policy in another State would be contrary to this statute? Clearly, we think, this question should be answered in the negative. The term "issued" in the phrase "issued . . in violation of the preceding section" manifestly refers to the delivery and acceptance of the policy in such manner that it becomes a binding and effective contract between the parties. Sisk *v.* Citizens' Ins. Co., 16 Ind. App. 565 (45 N. E. 804) ; Spencer *v.* Myers, 73

Hun, 274 (26 N. Y. Supp. 371); Hyde *v.* Goodnow, 3 N. Y. (3 Comst.) 266; Coleman *v.* New England Mutual Life Ins. Co., 236 Mass. 552 (129 N. E. 288); National Liberty Ins. Co. *v.* Norman, 11 Fed. (2d) 59, 61. It follows that the issuance and acceptance of the policy must be simultaneous, and that, as related to the present inquiry, what the statute was intended to prohibit is the formation of any contract of insurance, as an effective agreement between the parties, within the limits of this State, unless the insurer and its agent have been licensed according to law. In further support of this construction, we notice that one of the duties which the insured is required to perform in order to be relieved from liability after accepting a prohibited policy is to pay "the premium tax chargeable under the general tax act upon the amount of premium so paid" (sec. 2). By the general tax act the premium tax here referred to is a charge upon premiums "received . . in this State." Code, § 92-2509. Section 2 further provides that the penalty "may likewise be recovered upon the establishment of such fact in a civil suit brought in the name of the State of Georgia by the solicitor-general of the circuit where such act may have been done." What is meant by the phrase "where such act may have been done"? Apparently, this expression refers to the acceptance of the policy by the insured, or to its delivery and acceptance as a binding contract between the parties. Several things are stated as conditions precedent to liability of the insured, but the word "act" seems to apply more fittingly to acceptance of the policy, or to its delivery and acceptance, than to any of the other conditions. If the suit is to be brought by the solicitor-general of the circuit where such "act" may have been done, it necessarily follows that the act must have been done in the State of Georgia. Our conclusion is that since the petition in the instant case did not allege that this policy was issued and accepted in the State of Georgia, it failed to state a cause of action against the insured; and therefore that the court erred in not sustaining the general demurrer and dismissing the petition.

*Judgment reversed. All the Justices concur, except Russell, C. J., and Jenkins, J., who dissent.*

ON REHEARING.

BELL, Justice. A rehearing was granted in this case, in order that the statute might be re-examined lest an erroneous construc-

tion may have been adopted in the original decision. After further consideration, we find ourselves unable to reach a different conclusion, and must therefore adhere to the original judgment and opinion. Whether or not the policy issued to the defendant might have been void and unenforceable under some other law of this State or as being against the public policy of this State, the defendant's liability for the penalty sued for necessarily depends upon whether the policy was issued in violation of the particular statute, to wit, the act of 1935. It would seem reasonable to say that under this statute the defendant insured is to be penalized only for the acceptance of a policy which the insurer could have been penalized for issuing. In other words, if the policy was not issued under circumstances rendering the insurer liable, then there would be no penalty upon the insured for accepting it. A reference to section 1 of the act in question will disclose that it mentions in general terms a number of things which an insurance company is prohibited from doing unless it is licensed to engage in such business within the limits of this State, but as to such company the penalty is only "for the violation of this provision on the part of the corporation . . illegally engaged in the writing of business in this State." From this and the other language of this section, it is apparent that the legislation was intended to cover only such acts as were done in the State of Georgia. If the statute did not intend a penalty against the company merely for the act of writing a policy without the limits of the State, it would seem to follow as a necessary corollary that the insured would not be liable for the acceptance of such policy. Some authority has been cited for the purpose of showing that the legislature would have had the power and jurisdiction to penalize the writing or issuing of such a policy without the limits of the State of Georgia; but, as stated in the original opinion, we have not deemed it necessary or proper to discuss the authority of the General Assembly in this connection. Since we have concluded that the legislature did not intend to prohibit any acts except such as were performed within the State of Georgia, we do not reach the question of its power to do more.

In the original opinion we rather assumed that in certain provisions of the policy in relation to appraisal, adjustment, and settlement, the parties may have contemplated that the insurer would

perform acts in this State in violation of the statute under consideration. On further examination, however, it appears that the stipulations in regard to these matters merely provided that each of the parties should do thus and so on demand of the other, with options to the insurer as to some other matters, but with no absolute or unconditional obligation in reference to any of them. Therefore it would seem that the contract did not necessarily contemplate the performance by either party of any act in violation of the law of this State. For aught that appears, the insurer could have complied with the law after the policy was issued, and before anything was done in virtue of it; and in that event clearly neither party would have been subject to penalty. We can not escape the conclusion that the policies involved in this case, if delivered and accepted without the limits of the State of Georgia, were not "issued in violation of" the act of 1935.

*Judgment adhered to. Atkinson, P. J., and Hutcheson and Grice, JJ., concur.*

JENKINS, Justice, dissenting. Section 1 of the act of March 28, 1935, provides: "No corporation . . not licensed in Georgia to transact the business of . . casualty insurance . . shall so engage in such business within the limits of this State." Section 2 provides: "No . . corporation . . doing business in this State shall accept a policy of . . casualty insurance. . . issued by a non-admitted company . . in violation of the preceding section, unless . . [it] shall . . report the fact to the insurance commissioner," etc. The only question dealt with by the majority opinion and the only question considered here is, as stated in the majority opinion, "Is a policy issued 'in violation of the preceding section' (that is sec. 1), unless it is issued within the limits of the State of Georgia?" The majority opinion appears to limit the prohibition of and penalty upon the acceptance of a policy issued contrary to the terms of section 1 to the one naked question as to whether the prohibited written instrument was delivered and accepted in this State. Since the policy covering property in this State was issued by an unlicensed non-resident corporation and delivered in another State to a non-resident corporation doing business in this State, the opinion holds that the policy was not "issued" in violation of section 1, and there is no penalty against the insured for accepting it, "regardless of whether

the insured may otherwise have violated 'the preceding section' either before or after the issuance of the policy." The opinion seems based upon the assumption that even if the stipulations expressed in the policy at the time it was "issued" in fact "amounted to the transaction of insurance business within the State," yet since the acts provided for by the policy were to be done and were in fact done within this State subsequently to its "issuance," the "issuance" was not in violation of section 1 prohibiting an unlicensed corporation to "engage in such business within the limits of this State." If it be conceded that the policy issued by the unlicensed company provided by its terms at the time of its "issuance" for the *illegal transaction of insurance business* in this State, it would seem that the "issuance" itself was illegal and in contravention of section 1, which prohibits an unlicensed corporation from engaging in insurance business in Georgia. If the insured by its contract required that section 1 be violated, it would seem the contract was "issued" in violation of section 1. Section 2 does not in fact require, in order for the penalty to be incurred by the acceptance of an illegally issued policy, that the policy shall be issued, delivered, or accepted in Georgia. What it *does* provide is a penalty for the acceptance of a policy issued by an unlicensed corporation which "shall so engage in such business within the limits of this State."

In *Jalonick* v. *Greene County Cotton-Oil Co.*, 7 *Ga. App.* 309 (66 S. E. 815), it appeared that an insurance association not authorized to do business in Georgia issued in Texas a policy of insurance covering property in this State, and mailed the policy to the owner in Georgia. The insurer afterwards brought suit against the insured, to recover the premium. The Court of Appeals held that the plaintiff could not recover, because it was not authorized to do business in this State. In its decision the court said: The law "prescribes certain prerequisites to the doing of any insurance business in this State. Plaintiff has not complied with any of these prerequisites, and immunity is claimed because the contract of insurance was made in Texas. It can not be supposed that the purpose of the law was to prevent the act of making the contract in this State. The object is to protect the people of this State against irresponsible companies or individuals, and to prevent all unauthorized companies or individuals from writing insurance on

property in this State, or from transacting any sort of insurance business in this State."

Any other construction would leave this statute open to the easiest sort of evasion, in that any non-admitted company and any prospective insured could merely step across the State line and there with perfect immunity execute an insurance contract which would be clearly in violation of this statute if delivered and accepted within the borders of this State. The majority opinion has given recognition to the rule that statutes of penal nature shall be most strongly construed against the State. It has also given recognition to the more important and more controlling rule that "Penal laws should be construed strictly, but they should not be so construed as to defeat the obvious intention of the General Assembly. In construing an act, whether of a civil or penal nature, the intention of the General Assembly should be sought for, keeping in view the evil and the remedy." *Atlantic Coast Line R. Co.* v. *State,* 135 *Ga.* 545 (69 S. E. 725, 32 L. R. A. (N. S.) 20). See also *Mathis* v. *Fulton Industrial Cor.,* 168 *Ga.* 719 (149 S. E. 35) ; *Singer Mfg. Co.* v. *Wright,* 97 *Ga.* 114 (25 S. E. 249, 35 L. R. A. 497) ; *Wellmaker* v. *Terrell,* 3 *Ga. App.* 791 (60 S. E. 464). It may be also suggested that if the construction here given be not the correct one, then the act of 1935 with reference to these matters was a vain, a futile thing.

The act in question is not a new departure. It appears to be an effort to correct what must have been abuses not covered by previous enactments. Before the act of 1935 the legislature had provided that no insurance company could operate in Georgia until it had been duly qualified; no agent could represent such a company until he had been duly qualified; and no qualified agent could represent an unqualified company. As was quoted by Justice Lumpkin in *Gillis* v. *Gillis,* 96 *Ga.* 1, 8 (23 S. E. 107, 30 L. R. A. 143, 51 Am. St. R. 121), "The presumption against absurdity in .the provision of a legislative enactment is probably a more powerful guide to its construction than even the presumption against unreason, inconvenience, or injustice. The legislature may be supposed to intend all of these; but it can scarcely be supposed to intend its own stultification." (Endlich on Statutes, §§ 264, 295.) The construction of the statute given by the majority opinion would defeat each of what would seem to be the manifest purposes

of the legislation: first, to protect residents of Georgia against fraudulent and unsafe insurance companies, by giving the insurance commissioner of Georgia some measure of control and supervision over *all* companies desiring to transact *any* business in this State, and by safeguarding citizens who may have losses by requiring *all* insurers who transact any business herein to become suable in the courts of this State; second, to guarantee to the State the income from all of the insurance on property located in this State by any company which may transact any business therein through license, premium, and ad valorem taxes, and other forms of taxation which are now or may hereafter be levied by law.